Okay, if counsel are ready for our last case. Pharmaceutical Research and Manufacturers of America v. Andrew Stolfi. Good morning. May it please the Court. Pinesh Shah for the Oregon Department of Consumer and Business Services asking this Court to reverse the District Court's grant of summary judgment both on the compelled speech claim and on the takings claim. And although I'm very happy to accommodate redirection from the Court, I'd like to start with the compelled speech issue. On that issue, much of what I have to say today circles around the same fundamental idea. Would you slow down just a bit? Yes, Your Honor. I will try. It's a problem that I have. I will certainly try. And the same fundamental idea that's at issue here is that what this case is about is the reporting of historical facts, not the kind of expression that implicates the First Amendment. Don't you ask them for the strategy as they're pricing? I'm sorry. Say that again, Your Honor. Don't you ask them to tell you about their strategy as they're pricing, the factors that go into their pricing? How is that historical fact? Your Honor, those are historical facts because those are — whatever strategy they may have used are the factors that — it's the same thing as if in a trial you ask somebody, why did you enter into a contract? That's a historical fact. Well, why you — you can ask a witness, why did you enter into a contract? Because he's compelled to testify by the State. These people are not compelled to give you information. Well, Your Honor, the question — we're saying this is compelled commercial speech. And so if it's compelled and whether that compulsion is permissible is answered by Zauter. But at the outset, our point is this is not factual. I mean, I'd rather that it is factual. The strategy on pricing is factual? It is not subjective and given to a bunch of non-historical factors such as fashion and acceptability and what other people are doing? It is, Your Honor, subjective. But why a person did a thing in the past is not subjective. That is objective. A person can have subjective motivations for doing something, but when they ultimately do the thing, why they did it is a question of objective and historical fact. Why they did it? Correct, Your Honor. You want to find out why, not what they did, but why they did it. Correct, Your Honor. I think so. That is a question of historical fact, just like so many questions of historical fact that are resolved at trial on which this Court would defer to the fact finder because those are questions of historical fact rather than questions of law. Can you give an example of what the agency would consider to be a satisfactory response to that question about the factors that, you know, I can't remember the exact wording, but led to the specific price increase? How explanatory does it have to be? Has this been fleshed out? Could it just be something as straightforward as a list? Supply costs increase, you know, I don't know, research costs and, you know, investor return. Period. I think that would be sufficient, Your Honor. If that is in fact, you know, if that explains the price increase. As long as it's accurate, factual, truthful, that's enough. Correct, Your Honor. That level of detail. Yes, Your Honor. Can you explain why X-Corp v. Bonta is materially different from this case? So, first, I think that the regulatory context is very different because what X-Corp was in the business of doing was sort of being a forum for expression. That's a very different context from the business of manufacturing and selling pharmaceuticals. So, already there's a very different sort of First Amendment overlay between these two cases. And then the specific speech or what the law required in X-Corp, again, pertained to expressive conduct and also things that were, in fact, subjective, such as a definition of extremism, a definition of hate speech. Those things are subjective. Those are not questions of historical fact. And not only are they subjective and not questions of historical fact, they are incredibly partisan and politically fraught. And so, particularly, again, when it's in the context of an industry that is engaged in being a forum for expression, that is all expressive conduct. Very different from this situation, where we have a non-expressive industry reporting historical facts about financial data and pricing. Well, we're on the question of facts versus opinion. I had a question about the, for, I think it's the new drugs, that there's a requirement to provide an estimate of the expected prescriptions. I could argue that an estimate of expected, maybe an opinion or something, you know, it starts to get into, I mean, is that a fact? I suppose if they had one, you could say, if you made an estimate, what was it? But are they allowed to just say, we don't have one, we don't want one, or, you know, we are unable to make one? I mean, that one I find a little bit tricky in terms of it doesn't seem to be asking for a historical fact. Correct, Your Honor. Though, to the extent that they have made estimates in the past, whatever their past estimates were are a historical fact. Right, but that's not exactly what the statute seems to be asking for. And then, of course, I think there's this other point that none of this is expressive. There's no message being conveyed when somebody is asked to make a sort of market assessment. But also, the new prescription drug statute wasn't challenged, right? That's C-6, and it seems like the only thing at issue here is 3, right? That's right, Your Honor. And I guess what confused me is that the summary judgment motion before Judge Mospin was all briefed on specifically 3C, the factors that contributed to the price increase, but he entered declaratory judgment as to all of 3, even though it looks like you didn't brief 3A, B, D, E, F, A, B, C, D, G, H, et cetera. Is that right? That's right, Your Honor. And in fact, really, the briefing didn't even — it focused on just one element of the rule. Calm down. Calm down. It focused on just one element of the rule, which was the narrative statement section of the rule, and that rule has a number of other sections that were not litigated that were also struck down. What sections are you referring to? Can you give a specific number? So I can tell you that the rule — I could go get the rule, or I could tell you that — Well, you can, on rebuttal, just — Sure. Yes, Your Honor. — tell us what it is. If we determine that declaratory relief isn't available for the takings claim, do we need to reach the merits of that claim? I don't think so, Your Honor. I think particularly if you agree that the reason the declaratory relief isn't available is because there's no injury in fact, if the claim just simply isn't ripe at this juncture. On the takings issue, as far as I know, it's still an open question on whether even a facial claim is possible for a regulatory taking, assuming that this consensual applies here. There are a lot of questions. There's been a lot of direction from the Supreme Court about properly assessing facial challenges. And then I think there's a lot of overlap with ripeness considerations here. One of the things that I'm trying to figure out is whether we can really assess whether there — I mean, as a threshold matter, my understanding is there's a question of state law as to whether there is even a property interest in a trade secret. And the Supreme Court in Ruckelshaus said that is a function of state law because the federal Constitution does not create property rights. I've tried to figure out. It wasn't, as far as I can tell, addressed in the briefing. Does Oregon create a cognizable property right in trade secret? And there is case law, for example, Stimson Lumber Company versus Lawrence David, where the Oregon court said essentially they reject the property theory of trade secrets and they think it arises only from a relationship of trust. So as a threshold matter, I think there's a question of state law that has not been fully developed unless you are aware of an Oregon interpretation or statute that says trade secret is a property right in the state of Oregon. I'm sure my opponent will have plenty to say about this, but I think — I'm not familiar with the case you cited, Your Honor, but I wonder if it predates the statutory enactment of Oregon's version of the Uniform Trade Secret Act. Well, my trouble there is, first, the Trade Secret Act, the definition that was adopted in this law does not actually coincide with the Trade Secret Act. It borrows from the public records law instead, and those definitions of trade secret are not actually identical. So then there's a — I guess then, would you be conceding then that the Trade Secret Act creates a property interest? I will concede that trade secrets, as recognized in the Oregon Trade Secret Act, creates property interests but subject to the public interest disclosure requirements that are contained in the Oregon public records law and have been since before the Trade Secrets Act was created. Okay. So you're not disputing whether trade secrets, as defined in HB 4005, qualifies as property under Oregon law? I'm not disputing that, Your Honor. Okay. But again, that is subject to whatever else exists in state law. I want to say public interest exception, I understand. Right. How do you, for the Penn Central factors, can you elaborate on the economic impact of the regulation? How would you define the value of the property as a whole? I think that's a difficult question to answer, Your Honor, when we don't even know what trade secret has been taken. It very much depends on what the trade secret is, and that simply cannot be assessed in this facial challenge where there has not been a taking or an injury, in fact. I guess I'm just wondering, is a trade secret, and I'm sorry to interrupt you, is it, you know, is trade secret relatively unimportant to the value of the drug overall? Like, are we talking about marketing trade secrets? Are we talking about advertising trade secrets? Like, what, do you understand? I understand your question, Your Honor. I wish I knew. It's not clear what particular types of trade secrets PhRMA is concerned about here. Well, I think they're concerned about their pricing strategy, and once that trade secret is made known to their competitors, it loses its value, doesn't it? I don't understand their trade secret. You're only disclosing it, but you're disclosing it to their rivals. I don't understand their trade secret claim to be focused on the same material that's at issue in the First Amendment claim. Those are two separate claims, as I understand them, Your Honor. And so I don't know that they've identified a particular trade secret disclosure that they consider to be a taking. Well, that's not the way I see it, but go ahead. So if we assume that that's the trade secret that we're talking about, the pricing strategy, well, I think the first answer to this question is that under state law and under Ruckelshaus, there is no protection for trade secrets if there's no express guarantee, if you disclose it without an express guarantee of confidentiality. And so any disclosure here will be made knowing that what you disclose is subject to the public interest exception and can be disclosed to the public, and so that destroys the trade secret nature of this. And if they don't want to do this, just like in Ruckelshaus, they can decide not to sell their products in Oregon. But Oregon has not disclosed any of the trade secrets that have been identified by any of the reporting manufacturers, correct? That is correct, Your Honor. And there's no present intent to disclose any of the self-identified trade secrets provided by the manufacturers, correct? I'm not aware of any present intents. What would the process be? So I understand there is a process for appealing a disagreement about whether the information at issue is a trade secret under Oregon law. Then is there also a process for disputing or appealing a determination that disclosure is required under the public interest exception? I think that would likely qualify for review as a final agency action under the Oregon Administrative Procedures Act.  And then what about the compensation? If there was a determination that there was, in fact, under law, a trade secret that was then disclosed, what would be – is there a mechanism under Oregon law for compensation? What is that? Oregon courts regularly entertain inverse condemnation actions, and so that would be certainly available in this case if there was a claim for a taking. Let me ask you, you know, pharmaceuticals are a highly regulated industry. Why do manufacturers have reasonable expectations of confidentiality, and are there different expectations if it's manufacturing versus marketing? Are there different sort of expectations or levels of confidentiality expectations based on the specific category of information? I think yes, Your Honor. I think also that's governed by how they interact with the regulatory framework, you know, which again returns me to this idea from Ruckelshaus that if you engage voluntarily with a regulatory framework that asks you to disclose information and you choose to voluntarily disclose that by doing business, and then you're – and there's no express guarantee of confidentiality, then it's sort of – that should be dispositive. It was in Ruckelshaus, and it is here. And so unless the Court has questions now, I'd like to save the rest of my time for rebuttal. Okay. Oh, go ahead. To address the question of substitution, do you think it's permissible to ask the manufacturer, what generic drug that sells at a lower price than yours can be easily substituted for your product? So again, that particular part of the law was not briefed or challenged below, as I understand it. But to answer your question, Your Honor, that is permissible. That is the kind of commercial speech that can be assessed under Zodderer, and if there's a substantial government interest in understanding those factors, then yes, it can be compelled. And what little time I have. Isn't the name of generics on the market just publicly available information? I think in many cases it is. I think much of this information, in fact, is disclosed in other situations. I think there's a declaration in the SCR from an agency employee talking about how much of the stuff that has been claimed as trade secret has been disclosed in SEC filings and in other public filings. So yes, much of this information is, in fact, actually available. But for SEC filings, you only referred to executive compensation, right? What other disclosures in SEC filings do you think would have been illustrative here of what's permissible in other contexts? When I was talking about executive compensation in my brief, Your Honor, I was just speaking by way of analogy. But there is, I'll try to find it for rebuttal, in our ER, a declaration from somebody named, I think, Soucy or Ducey, explaining specifically the kinds of disclosures that farmers' members have made to the SEC and other regulatory bodies that cover much of the same stuff that they're claiming as trade secrets. Okay, I would be interested in knowing what that is. So please bring that back on rebuttal. And if the Court will allow me some time on rebuttal, then I will do it.  Thank you, Your Honor.  Go ahead, please. Thank you, Your Honor, and may it please the Court, Alon Ketem for Pharmaceutical Research and Manufacturers of America. HB 4005 compels drug manufacturers to justify their own pricing decisions by writing reports exposing some of the most sensitive and closely guarded information they use to make research and development, production, and marketing decisions. The State then publishes that information on the Internet, destroying manufacturers' trade secrets, whenever the State's agency decides that doing so is in the public interest. That's not actually happened yet, ever, though. It hasn't, although there was a really interesting exchange in the district court argument, where the court asked the State why it was that no disclosures had been made, despite the fact that the public interest exception is mandatory. At page 137 of the excerpts of record, there's a declaration explaining that the State considers publication under the public interest exception mandatory whenever a trade secret meets the qualifications. And what the State was asked is, is it possible that this litigation is the reason that you haven't made any of these disclosures? And counsel for the State admitted that that was, in fact, possible. So there is no question. So this goes, I think, to the question, can there be a facial challenge? There is no question. The statute is mandatory. There are implementing regulations that are also mandatory. And the State submitted a declaration from someone who implements the law saying that there is no choice in the matter. This was also a finding made by the district court, I think at page 13 of the excerpts of record. Let me ask you. I have a little bit of concern about how this was litigated. Your motion for summary judgment only challenged 3C, and yet you sought a declaratory judgment for all of 3, without briefing or litigating or having oral argument on A, C, D, E, G, H, I, J, K, L, everything that's implicated. Don't you think that's an overbroad declaratory judgment? If there was no briefing, it wasn't argued, and you only addressed C. So hopefully I can reassure you there was, in fact, separate briefing. After the oral ruling by the district court, he invited the parties to separately brief the scope of the remedy. And the central dispute between the parties on this issue was whether it should only lead to invalidation of subsection C or the others. But the declaratory judgment order doesn't have any analysis. The only analysis is the summary judgment one, and it only analyzes 3C, correct? So I think I would disagree with you in this respect. In the written ruling that the district court issued, he said that the State had forfeited any argument that there could be a severance between subsection C and the rest of the statute. But there are other considerations, including constitutional considerations about State authority that require us to consider severability. Even if this Court decides it was an abuse of discretion for that or other reasons, the rationales apply more broadly. And that actually goes to the Ex Corp v. Bonta case, which I think it's worth diving into, because there the Court said, and this is at, I believe, page 23 of the slip opinion, that even a pure transparency measure, meaning a measure requiring disclosure of existing information, if it compels noncommercial speech, is subject to strict scrutiny. So even with respect to all of those other purely historical elements, it would still have to satisfy strict scrutiny, which the State hasn't even attempted to satisfy here. But how does this law require manufacturers to express any normative views? I mean, Ex Bonta, it required, you know, Ex to basically define hate speech, racism, extremism, radicalization, disinformation, misinformation, harassment, foreign political interference. So in footnote... So how is that analogous? So I think it's analogous. In footnote 9 of the Bonta decision, the Court said that the State there argued the same thing. Actually, let me take a different tack. Walk me through section 3 and tell me which ones are normative and which ones are noncommercial speech. Okay? So you've got a declaratory judgment on all of these, right? So let's talk about the length of time the prescription jug has been on the market. What is normative about that and what is noncommercial speech about that? That's not normative. But none of it is commercial speech. And if I could just take you back to... Okay, well, let's just figure out the normative first. Okay? So you say that's not normative. What about the direct costs incurred by the manufacturer? Is that normative? So there are a lot of value judgments that go into how you determine whether costs get factored in. Keep in mind for these drugs... So that is normative? It's just a question. Is that normative? So it involves normative judgments, yes. And keep in mind for... It involves judgment. Why are they normative? Why are they normative judgments? So there are questions about how you attribute... Let's say you do a bunch of research on a number of molecules or you do safety research for something, not specifically this drug, but includes one of the components. How do you decide about whether you factor those costs in? Or let's say you have patient assistance programs or other things. The question is, do you absorb those costs? Do you consider that just a cost of doing business? Or is it something that the company decides that it's doing because it just wants to help patients? That seems more of a question of how we would define a direct cost, which, again, maybe part of what troubles me about this facial challenge is there's very little... There's a lot of assumptions being made about how this law is being interpreted and applied. We're not supposed to interpret the law as broadly as possible and then strike it down. In fact, we're supposed to do the opposite. If there's a constitutional interpretation, we're supposed to adopt it. Yeah, so two things. First, even if you were to decide that all of this, despite the fact that there are value judgments or judgments involved, they're not value judgments, that's not the definition of commercial versus non-commercial speech. In ExCorp v. Bonta, this court reaffirmed the traditional definition of commercial speech as advertising speech. But you can't wipe out all the prior cases that found things like health and safety warnings and, you know, even know-your-rights information or commercial speech.  So, respectfully, it wasn't that the compelled disclosures, that that part of it was commercial. It's that they were alongside commercial speech. So take, for instance, the case that required disclosure of radiation risk for cell phones. It's not that that was itself commercial speech. It's that they were advertising the cell phones, and on the box it said, come buy this cell phone, it's great. I understand your argument is about the context in which the speech is being made. But then I run square into Riley's, where the Supreme Court said, you know, we're going to assume that the compelled disclosure, they assumed it without deciding, is commercial speech. And that was very similarly about profit of professional solicitors, fundraisers, how much fees they would keep from donations that they successfully got. And the court said you can't force them to intertwine that disclosure with the protected solicitation. But as a general rule, the state can compel these professional fundraisers to file the same exact information in detailed reports with the state and publish them itself. And that would actually cure the problem. And the court said that would be narrowly tailored to the state's interest in informing the public. So what do we do with that? So I think that's a classic Zatterer situation in which someone is advertising a service to the public. They say, we're going to take your money and do something good with it. And then there's a disclosure about the nature of the thing that you are offering. So are you, in fact, going to use my money in a valuable way? Here, the type of information being required is of a completely different nature. It has nothing to do with the terms under which the product is being offered to the public. The public already knows what's in the model. Pardon me. I mean, I guess I see that how much of the money you donate am I going to pocket for myself is very similar to the pricing information that's being requested here. So respectfully, I have to disagree. When you give money to a charity, you want to know what's going to happen to the money that you give. It's an essence of what it is that you are giving the money to the charity for. I mean, the court rejected that anyway, but go ahead. So even the state has acknowledged that this is a type of information to which Zatterer has never been applied by this court. And as far as we know, no court has ever applied Zatterer to something other than the intrinsic qualities of the thing being offered for sale. You know what the pill consists of. You know the adverse event reports. You know whether it's contraindicated for certain things. You even know the price that you're being asked to pay for it. That is very different than asking a manufacturer to tell you about its internal decision-making for why it decided to charge one price versus another price. And once you untether the Zatterer doctrine from its underlying rationale of fully informing consumers about what they're being offered, there's essentially no stopping point. States could want all sorts of information on the theory that consumers would be interested in finding that information. I mean, I have a hard time because there's nothing about requiring a landlord to provide legal information that is inherently about the apartment that they're trying to rent out. So that's another classic Zatterer situation. If you're going to rent the apartment, you have to know, is there asbestos in the walls? But that's very different from asking the landlord to say, well, how did you decide to rent the property for X price rather than some other price? What were the factors that went into that? You don't require homeowners, for instance, to list, you know, you say, are there lead pipes in the building? That's something you have to disclose. But you don't have to disclose how it is that you came to choose to market the product at this price at this particular time versus something else. That's a type of information to which the Zatterer doctrine has never previously been applied. But I understand, going back to your argument of saying this, I think what you were trying to argue earlier and in your brief, you were trying to say because the state is compelling the disclosure of information to the state instead of in the context of an advertisement, which is direct communication from, you know, your clients to their potential customers, that that was a First Amendment problem that made it actually took it outside of Zatterer. But I don't know how you square that argument with Riley's. So I think the point is it doesn't matter that the disclosure is immediately alongside what you're being offered so long as someone, it relates directly to the nature of the thing that you are being offered. So then that comes back down to really the threshold question of whether this is compelling commercial speech. That's right. So that context is irrelevant. So I think it's both whether it is, in fact, commercial speech, whether it's describing the terms of an actual or potential transaction. That's the way that X Corp described it. And it also matters whether it's something about the product being offered, which this indisputably is not. Let me ask a couple of questions. I mean, I disagree with some of the things you said. I don't want to waste time on that because I see our time is limited. But I would disagree with your statements that no one has done this per Zatterer. I would, you know, full value advisors versus SEC, pharmaceutical care management versus Roe found that Zatterer was satisfied. And we can go through the specifics of that. But I would like to focus on two questions because there's limited time. So on the central Hudson analysis, the district court said, I do think there's substantial state interest here, but there wasn't any empirical evidence provided. And so I don't think it's narrowly tailored. And they did say that under inclusive because you're not making people other than the pharmaceutical manufacturer's report. I guess two questions. It does appear in the state's amicus brief and the Oregon Coalition for Affordable Prescriptions that they have provided pretty empirical evidence of what happens when their transparency law is enacted. But separate from that, why isn't it common sense that in any negotiation, if you reduce the information asymmetry, there's going to be more leverage and negotiating power that could result in more favorable pricing to consumers? So even if you thought that the state could satisfy its burden for intermediate scrutiny by relying on amicus briefs at the appellate level, the actual information that they provide is incredibly weak. It has cherry-picked evidence about certain, though not other, state disclosure laws and about the sort of general time frame under which disclosures are made and the prices, not even taking into account certain things like in 2020, the main year that they rely, we had a pandemic, which obviously had a huge effect on drug prices, among other prices. I'm not even sure why the state needs to prove that it will actually result in drug price decreases when there is also a purely informational interest that the state asserted and that the Supreme Court approved of in Riley's. So a purely informational interest makes a lot of sense if it's a question of, what am I getting for my money? And that would make sense, for instance, in the Riley situation, where you're giving money to a charity and you want to know, is the charity going to spend the money doing good things or is it going to spend the money on itself? That is totally different in the situation where we're just curious to know whether it is that— They want to be better informed as a major purchaser of pharmaceuticals. If that were—pardon me. If just being better informed were a sufficient rationale, then these tests would essentially be meaningless because— But let's look at Zouder itself. There wasn't any requirement that there be specific means, ends, fit evidence. The court just relied on self-evident possibility of deception. Let's look at Bolger v. Young. There wasn't any requirement that specific empirical evidence be required. I mean, this is not a requirement. Look at ExCorp v. Bonta. They didn't—you know, no specific evidence was cited to say the means and the ends fit. I mean, I could just keep going. Look at CTIA v. Berkeley. There wasn't any specific evidence of empirical connection. Full Advisors v. SEC, there wasn't. So that requirement doesn't seem to be present in other cases. So a couple of things. Full Value Advisors, the disclosure was just made to the SEC. It was not public. It's just a misreading of the case to suggest that there was a public disclosure at issue there. Oh, because there was a public—they just said it hadn't been done yet, so they put off not taking consideration of that requirement. So there were two requirements. One was under subsection F-1, there was a disclosure about the securities that were under management. That could go to the public. Then under F-2 or 3, there was an exemption process, and you had to justify why you qualified for the exemption process. That was the thing that they said was satisfied, but that information just went to the SEC. It was not made public. They did not opine on the F-1 disclosure that was made public. If I could briefly— Let me ask you one other question. If we conclude that the State didn't waive its severability argument, why aren't any unconstitutional provisions severable? So we think that all of the provisions would still be noncommercial speech and, therefore, under EXCORP, have to go through strict scrutiny. And we think even under intermediate scrutiny, the State has produced nothing, not even anecdotes. If we disagree, assume for the moment that we disagree. If we found some to be unconstitutional and some to be, why wouldn't we sever? So in that case, we would agree that it could be severed. Okay. Let me ask—I just want to confirm, you never challenged C-6, correct? Those are the provisions regarding a manufacturer introducing a new prescription drug. That's correct. That's correct. All right. So we don't even have to touch 6. All right. Thank you. Do you challenge the substitution requirement? Pardon? Do you challenge the substitution requirement? So we haven't challenged anything specifically about the new reporting requirements. Okay. I see that I'm over time. If the Court has questions about the takings analysis, I would love to get a chance to respond to some of the Court's questions, but I understand that my time has expired. I don't have any more questions, but let me, if my colleagues do, I'm happy to. Okay. I mean, I would be happy to hear a minute on— Okay. Take a minute. You're already two minutes over your time, but take a minute, please. Yeah. Sure. I appreciate that, Your Honor. So first, we just had the concession from the State, which they had to make that all of the information that is designated as subject to the public interest exception is, in fact, property under Oregon law. It's also property under the laws of all 50 States. Every instance in which the public interest exception is invoked, you know two things are true. One, the information qualifies as a trade secret and is, therefore, property under the laws of Oregon and all 50 States. And, two, it will be exposed and, therefore, all of the value will be destroyed. And that makes it appropriate for a facial taking claim in the same way as the Eighth Circuit case that we cite and in the same way as in Ruckelshaus, it was a pre-enforcement challenge. None of the information had been destroyed. Well, there'd also have to be, I mean, under the Penn Central test, weighing various factors, there'd have to be a determination of whether there was effort to, you know, whether reasonable efforts were made to keep it secret, whether there was reasonably backed, investment-backed expectations of confidentiality, which even if I put aside the State's argument that those were destroyed by complying with this law to do business in Oregon in the first place, there could be other things that show that there was not a reasonable investment-backed consideration. There is a question of value. And how is this, I mean, on top of the fact that we don't even know if this exception is ever going to, I understand there's a question, but there's, we don't know whether there's, it's ever going to be invoked. And then on top of that, we have the problem where the court has said there shouldn't be equitable relief in the takings context. We don't even know if a facial claim is actually cognizable here. Yeah. So a few things. Taking your last question first. In Nick, the court said you cannot get an injunction to stop a taking. That's not appropriate because takings, the government can take your property. They just have to pay compensation. What you can get and what the plaintiffs got in Nick is what we're asking for here, which is a declaration that if you take the property, you have to pay compensation at the time of the taking. If I remember correctly, though, Nick didn't involve a regulatory taking. Is that correct? It wasn't a regulatory taking, but once there is a taking, just compensation is due at that time. That was the square holding in Nick. The second, you had a question about all the preliminary determinations. But if Nick is the right framework, why isn't there an adequate provision for getting just compensation? Well, that was exactly what Nick rejected, is the idea that since you can get just compensation after the fact, there is no problem until you've been denied just compensation. Nick said no. The violation occurs at the time of taking if it is uncompensated. And that's why a declaration that an uncompensated — But there's been no taking here yet. So there hasn't been. What we need for a facial challenge is a credible threat that this provision will be enforced. How do you square that with the case law that says that the compensation can follow the taking? Pardon? There is a — there is a — there is case law that says the compensation can follow. So Nick squarely overruled the Supreme Court's prior doctrine that said you can wait until the taking has occurred and then force someone to go to get compensation. That was the — The acts of Nick were very unusual. So, respectfully, the Court reaffirmed that in the Pachtel case, among others, Centerpoint Nursery v. Hasid, all of those involved declaratory judgments that at the time of the violation there has to be compensation. Wait. Do you agree that there's an adequate provision for obtaining just compensation? We don't. The State has never identified it. And certainly there's no provision to provide compensation at the time of disclosure, which is what the Supreme Court would require under Nick. You asked a number of preliminary questions about how do we even know that there will be trade secrets. Maybe you haven't protected the information. Maybe it's not valuable. Those are all ancillary to the question whether there is a trade secret in the first place. If there's no trade secret, the public interest exception doesn't even come into play. It's only after you know that there's a trade secret. I mean, there's a reason why we're only supposed to decide actual cases and controversies with a significant amount of factual development. So you know, just as a matter of law, that if it doesn't meet all of the definitions of a trade secret, including that it derives information, that the information derives value from being held secret, then the public interest exception as a matter of law just doesn't apply to it. It only applies if it is a trade secret and destruction of all of that value occurs as a matter of law once, under the Ruckelshaus reasoning, once that information is made public. There is no instance in which the value of the information is retained after publication. The analysis under Penn Central would still require, I think, even after that happens, a trade secret, let's assume an actual trade secret that would qualify as a trade secret under Oregon law, then creates a property right, and then there's a finding of a public interest exception and a disclosure. There would still be a multi-factor fact-specific test that has to be applied to whether it is a taking. So that's correct, but Ruckelshaus tells us exactly how to do that, and it says, in the case of a trade secret, the first factor, investment-backed expectations, is so overwhelming as to render— In that case. They didn't say in every case. So I think Judge Torreya's decision, opinion in Riley, goes through this and explains there's no instance in which a trade secret can be exposed and it doesn't destroy 100 percent of the value of the secret. There's simply no leftover information. So then the application of the factors determine whether it's a taking. So that was exactly the argument that Judge Lopez made in dissent in that case. Respectfully, we think the majority in that case had the better argument. That's it. Not biting us. Understood. All right. You're almost eight minutes over your time. Thank you. Thank you. So I'll try to use my time to address the questions that Judge Koh had. First, ER 139, paragraph eight, is a declaration saying that one manufacturer submitted lengthy narrative descriptions for its marketing and pricing methodology for a new drug and claimed that the information was trade secrets. DCBS staff subsequently found all that information on publicly available websites, such as the manufacturer's own website, press releases from the manufacturer, SEC 10-K filings, and clinical trial information submitted to the FDA. So much of this information, as I think Judge Koh suggested, is simply not secret. As for the narrowness of the challenge, you know, there's three Cs, the statute, and then there's a rule, because a narrative statement, which is with a focus of the argument at the district court, that narrative statement doesn't appear in the statute. It appears in the regulation, which is Rule 836-200-0530, and that has a number of other requirements that are not found in the statute that the district court improperly struck, including, for example, the full chemical name and biologic product name of the drug. There's nothing. So if, assuming there was a problem with the requirement of a narrative statement, then at most, then that rule would go away, is what you're saying? That would be the appropriate remedy, Your Honor, based on what was litigated below. And then, if I can address a little bit— I'm sorry. I may have missed this. The declaratory judgment, I thought, was just on Section 3, but you're saying it was also as to this Reg 836-200-36? I think it was— I'll look it up later. Okay. I'll look it up later. As for the takings, I think I'll say Mr. Kedem cited a U.S. Supreme Court case, Pactel. That case requires an actual injury. It says that you can't have a claim unless the government's actions actually injured somebody and it prevents prematurely suing over a hypothetical harm. It says, and I'll quote, the court must first know how far a regulation goes before it knows whether it has gone too far. And it says that until the government makes up its mind, the court will be hard-pressed to determine whether the plaintiff has suffered a constitutional violation. These are all problems in this case. There's no actual injury. And as for this question of whether Ruckelshaus says you can just make it all a question of reasonable investment-backed expectations, well, in Ruckelshaus, the only basis for a reasonable investment-backed expectation was an express promise of confidentiality, which is missing here. So even if you were to map these claims that the plaintiff has here against the claims in Ruckelshaus, most of the claims in Ruckelshaus were rejected because there was no express guarantee of confidentiality. These claims here look like those. They do not look like the one narrow set of claims that prevailed in Ruckelshaus because there was an express promise of confidentiality, which is lacking here. So that's ignoring the actual injury problem, which we think really prevents the court from even addressing it. And so unless the court has further questions, we ask the court to reverse on both claims. You know, I do. And I just want to follow up on Judge Bea's question. He asked you about 3D, the name of any generic version of the prescription drug available on the market. I know we talked about earlier that's generally publicly available information, but that's not information about the manufacturer or the reporting party's product. So why would that count as the commercial speech of the manufacturer that's reporting? It's still information related to the market, Your Honor. And I think information about a market is still commercial because it still pertains to the act of selling this drug in that market. Whether it's a transaction or not, just for transparency purposes. Yes, Your Honor. That transparency was dealt with in X-Corp, wasn't it? X-Corp involved expression, Your Honor. This case does not involve expression. Do you agree that NIC is the appropriate framework for the declaratory relief analysis? Yes, Your Honor. I think the Supreme Court's precedent on this has been a little bit confusing at times, so I think you might find conflicting statements in other cases. But, you know, NIC is binding on this Court. But if it relied on Cedar Point and Cedar Point didn't address remedies at all, how do we reconcile that? I think that those cases have more to do with a question of injunctive relief, as I understand them. Am I mistaken, Your Honor? You look like you think I'm mistaken. Well, I mean, Cedar Point was a denial of a preliminary injunction. I'll be candid with you, Your Honor. I'm not sure I'm prepared to answer that question. Okay. That's fine. That's fine. I don't have any more questions. Let me see if my colleagues do. Okay. All right. Thank you very much to both counsel for very helpful arguments in this very complicated case. Thank you very much. And we are adjourned for the day. This case is submitted. Thank you. All rise.
judges: BEA, KOH, SUNG